## NEW ENGLAND FOIL CORP. *v.* UNITED STATES

**No. 5591.**—Invoices dated Kirchberg, Switzerland, December 20, 1938, etc.
Certified December 23, 1938, etc.
Entered at New York, N. Y., January 4, 1939, etc.
Entry No. 781405, etc.

(Decided on rehearing (Reap. Dec. 5310) March 6, 1942)

*Strauss & Hedges* (*Eugene F. Blauvelt* of counsel) for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Dorothy C. Bennett,* special attorney), for the defendant.

DALLINGER, Judge: The appeals to reappraisement listed in the schedule which is marked A and annexed to and made part hereof involve the question of the dutiable value of certain aluminum foil imported from Switzerland during the months of January, February, March, and April, 1939. All of said foil was appraised on the basis of foreign value under section 402 (c) of the Tariff Act of 1930. It was entered on the basis of export value under section 402 (d) of said act, which is claimed to be the proper basis for determining the dutiable value of said merchandise.

The said appeals are expressly limited to the aluminum foil represented by items marked A and initialed F. C. G. and by the items marked B and initialed F. C. G. on the invoices accompanying the entries covered by said appeals. It is agreed that the items so marked represent converters' aluminum foil of .00035-inch gauge, and that there was at the time of exportation no foreign value for said merchandise.

The only question at issue is whether the evidence herein substantiates the claim of the importer that there did exist an export value for said merchandise.

This case was decided by me on June 13, 1941, in Reap. Dec. 5310. It is again before me as a result of a rehearing granted both parties.

At the hearing, held at New York on November 19, 1940, the plaintiff offered in evidence the testimony of two witnesses. The first, Frederick Gribi, general manager of the plaintiff corporation, testified that his company imported aluminum foil on its own account and also acted as agent for Nyffeler, Schupbach & Co., the foreign manufacturer of the aluminum foil at bar; that as such agent his corporation obtained orders, transmitted the same to said Nyffeler, Schupbach & Co., made the necessary customs entries, paid the duty, and collected the purchase price from the customers, remitting the proceeds to said manufacturer and exporter; that his company had no power to accept any order of purchase, but was obliged to transmit said order and await confirmation by the said foreign manufacturer; that the aluminum foil marked A on the invoice was imported for the Standard Rolling Mills; that the order was transmitted to the foreign manufacturer in Switzerland; that the price agreed upon was $6.50 per ream of 260,000 square inches delivered at the Standard Rolling Mills' place of business in New York City, which price included duty; and that the New England Foil Corporation, the plaintiff herein, was the importer of record.

At this juncture counsel for the Government conceded that all of

the items marked A and initialed F. C. G. in green ink consisted of converters' foil of .00035-inch gauge. Also, the original orders sent to Nyffeler, Schupbach & Co., together with acceptances of the same, with accompanying invoices, were admitted in evidence as collective exhibits 1 and 2.

The witness then testified that he was a native of Switzerland, and that there were three manufacturers of aluminum foil in that country.

On cross-examination the witness testified in part as follows:

X Q. You said you had the agency in the United States for Nyffeler, Schupbach & Co. Do you have the exclusive United States agency?—A. No.

X Q. What did you mean when you said you had the agency?—A. I meant to say we act for the firm in transmitting the orders to Switzerland, paying the duty, cashing the invoices, and remitting the money.

X Q. You act as selling agent in this country for Nyffeler, Schupbach & Co., is that right?—A. That is right.

X Q. On a commission basis?—A. That is right.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Did you receive a commission on all the shipments now before the court?—A. That is right.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Does the New England Foil Corporation use foil itself?—A. That is right, as a converter.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. So when you sold to yourself, the New England Foil Corporation, you also acted in those sales as agent of the foreign manufacturer, selling to your own Company on a commission basis, is that right?—A. That is right.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Did all this foil go to yourself or the Standard Rolling Mills?—A. The Standard Rolling Mills.

X Q. Did you testify Mr. Gribi, that you made all collections for payment for these shipments here in the United States?—A. That is right.

X Q. The Standard Rolling Mills paid you?—A. That is right.

X Q. That price included the American duty and all expenses?—A. All expenses.

X Q. And then you filed the entries in your own name?—A. That is right.

X Q. And you paid the American duties?—A. That is right.

X Q. And expenses?—A. That is right.

X Q. And you deducted your commission?—A. No.

X Q. You transmitted the balance to the foreign manufacturer?—A. That is right.

X Q. And then you received your commission later?—A. That is right.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Did you have any other prices during this period other than the prices shown on Collective Exhibits 1 and 2?—A. No, that was the only price paid.

X Q. Was the price static?—A. Static.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Was the duty uniform during that period?—A. To my recollection, yes.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Are you familiar with the amounts of American duties that were paid?—A. Yes, I know them.

X Q. What were they?—A. 20 per cent on the colored foil.

On redirect examination the witness testified in part as follows:

By Mr. BLAUVELT.

\* \* \* \* \* \* \*

R. Q. Did you receive a commission for selling merchandise or for acting as collecting agent?

\* \* \* \* \* \* \*

The WITNESS. It is considered a fee for the work we do, for the Swiss mill.

R. Q. I believe you testified on direct examination—if I am wrong, stop me—that you never accepted any orders but merely transmitted them.—A. That is right.

On recross-examination the witness testified in part as follows:

R. X Q. Mr. Gribi, you offered the merchandise to the American purchasers?—A. That is right.

R. X Q. And then you sent the order to the foreign manufacturer?—A. That is right.

R. X Q. Who either accepted or ——?—A. Refused.

R. X Q. Did he ever refuse any?—A. Yes, it happens once in a while.

R. X Q. During 1938?—A. I think so.

\* \* \* \* \* \* \*

R. X Q. And that is what you were paid your commission for?—A. That is correct.

The plaintiff's second witness, Fred C. Guerriero, United States examiner of merchandise at the port of New York, testified that he had passed and advisorily classified the merchandise here under consideration; that according to information received by him there were three manufacturers in Switzerland exporting aluminum foil to the United States; and that in the course of his duties he had reason to ascertain whether or not these three manufacturers freely offered their merchandise for sale in the United States. The witness then proceeded to testify in part as follows:

By Mr. BLAUVELT.

Q. And have you found any but Nyffeler, Schupbach & Co., have offered converters foil freely for sale to the United States?—A. No, I think Nyffeler, Schupbach & Co., is the only one that freely offer it.

Q. Have you in your official capacity appraised or advisorily appraised entries of converters foil which was manufactured by Nyffeler, Schupbach & Co., imported by the New England Foil Corporation, from August 1, 1938, until 1940, on the basis of export value.

\* \* \* \* \* \* \*

The WITNESS. Yes, I did take the standard export value or the freely exported price.

Q. And are those entries which I now show you, some of the entries which were appraised on the basis of export value as a result of the reasons you have just stated?—A. I seem to find several here same foil as that, others are similar foils.

Q. Did you appraise these entries that you have before you now on the basis of invoice price, less duty, less ocean freight, less freight Basle to seaboard, less local handling charges?

Mrs. BENNETT. I object to that as a leading question Your Honor. He can say——

Judge KINCHELOE. He can ask him how he appraised it.

Mr. Blauvelt. I will withdraw it. How did you appraise the merchandise?

Mrs. Bennett. I object unless we know what entry he is talking about, and it is somewhere——

Mr. Blauvelt. Which entry did you have reference to or which entries that you just spoke of was the same merchandise?

Mrs. Bennett. What is the Entry number?

The Witness. Entry No. 701587.

Mrs. Bennett. What is the date?

The Witness. Date of exportation June 27, 1939.

Mrs. Bennett. I object Your Honor, that is a year after the date of exportation here involved.

Mr. Blauvelt. Oh no.

Mrs. Bennett. He said 1939.

Mr. Blauvelt. These entries are in 1939.

\*      \*      \*      \*      \*      \*      \*

Mr. Blauvelt. I offer that entry in evidence, and then I will question him further about it.

At this juncture the entry in question was admitted in evidence as plaintiff's exhibit 3.

The witness then continued his testimony in part as follows:

By Mr. Blauvelt.

Q. Now does the entry now marked Plaintiff's Exhibit 3, cover converters foil, the same as that involved in these appeals to reappraisement marked "A"?— A. Yes, it does.

Q. How did you appraise that merchandise?

\*      \*      \*      \*      \*      \*      \*

The Witness. I appraised it on the basis of export value, $6.50 per ream of 260,000 square inches, less 2 per cent, less freight, handling charges, and freight from Basle to Havre, less ocean freight, less insurance, consular fee, and less the duty.

Judge Kincheloe. Did you appraise that merchandise before you appraised this?

The Witness. No, this is subsequent.

By Mr. Blauvelt.

Q. And do you have the figures there for the ocean freight and inland freight and so on?—A. Why the local freight and handling charges from Basle to Havre 5.89 Swiss francs per hundred kilos, gross.

Q. That means gross weight, does it?—A. That is the gross weight of the shipment. The ocean freight $10.00 per hundred kilos, plus the insurance; the consular fee is a pro rata business and it runs into cents and dollars.

Q. And that you found as shown on the invoice?—A. No. I don't think all these charges are indicated on the invoice.

Q. I note on the blue sheet on this invoice, for the amount shown as insurance and consular fee, which is bracketed with the letters in blue "N. D." Are those the figures you took in the appraisement?—A. No, I don't think they were, when you come to work back on my figures. The insurance should tally, but when it comes to a question of freight, there is where it may vary due to the fact that I allowed what I considered the average freight rates, instead of the actual freight shown on these invoices, \* \* \* sometimes shipment was larger than others, other times when the shipment was smaller, they paid a smaller amount.

At this juncture another entry 805124 was admitted in evidence as plaintiff's exhibit 4, over objection of counsel for the Government. The witness then proceeded to testify in part as follows:

Judge KINCHELOE. Let me see if the court understands you. If I understand you, all those entries were made by the importer at the invoiced prices, on the basis of export value, is that right?

The WITNESS. That is right.

Judge KINCHELOE. And these importations here before the court, you appraised them on the basis of what?

The WITNESS. Foreign value.

Judge KINCHELOE. Then subsequently you made an investigation, is that right?

The WITNESS. Subsequent investigation, yes.

Judge KINCHELOE. After that you came to the conclusion, and did appraise them on the basis of export value at the invoice prices, is. that right?

The WITNESS. Practically speaking, with the exception of a few minor changes, on account of the freight.

Entries Nos. 778244, 776709, 775289, and 851845 were then admitted in evidence as plaintiff's exhibits 5, 6, 7, and 8, respectively, all over objection of counsel for the Government. The witness having then testified in regard to the last four entries as he did in regard to exhibits 3 and 4, proceeded to testify as follows:

By Mr. BLAUVELT.

Q. Mr. Guerriero, the six entries that you have just examined and testified about are typical are they not of the large number of invoices you returned and appraised on the basis of export value, subsequent to the date of your appraisements in the cases now before the court?—A. Yes.

On recross-examination the witness testified in part as follows:

R. X Q. Mr. Guerriero, did you state that the Swiss Trade Agreement provides the duty shall be 11 cents per pound, but not less than 20 per cent ad valorem, not more than 40 percent ad valorem?—A. That is right.

R. X Q. Then actually on no one of these entries to which you have testified was it certain what duty would be paid until it was finally appraised?—A. I think that is the case.

.Frederick Gribi, the plaintiff's first witness, being recalled on redirect examination testified in part as follows:

R. Q. Mr. Gribi, on each of the shipments here involved now before the court which you have already examined, was there a 2 per cent cash discount allowed for payment within ten days?—A. If paid within ten days.

R. Q. Was that freely offered to all purchasers by Nyffeler, Schupbach & Co.?—A. That is right.

Upon this record counsel for the Government contends that there exists for the merchandise at bar no export value, for the reason that there were no offers of sale in the country of exportation, all sales and offers of sale having been made in the United States by the plaintiff as agent for the foreign manufacturer. In support of this contention counsel for the Government cites the case of *United States* v. *Massce & Co. et al.*, 21 C. C. P. A. 54, T. D. 46379. I have carefully examined

said decision and am of the opinion that it is not here controlling. In that case the record showed that the foreign manufacturer and seller of the merchandise, whose principal office was located in Switzerland, had an American selling agency in the United States owned and controlled by it, the said American selling agency not being incorporated. On the other hand, in the instant appeals the New England Foil Corporation, the plaintiff herein, is a separate American corporation, not owned by the foreign manufacturer, which is a converter of the aluminum foil at bar for its own account.

Moreover, in the cited case the appellate court, among other things, said:

\* \* \* It appears from the record that no purchasers in the United Stater transmitted to Switzerland offers to buy merchandise such as is here involved, and no offers to sell such merchandise were made in Switzerland. It furthes appears that there was no contractual relationship entered into in Switzerland between the manufacturer and the purchasers in the United States. We think the fair import of the evidence is that the branch house of the manufacturer in New York sent to Switzerland orders for designs, and that the orders were finally accepted or rejected by the New York branch house. In other words, the acceptance of the design was, so far as the United States purchaser was concerned, made in New York and not in Switzerland, for apparently the manufacturer in Switzerland had no communication or relations with purchasers in the United States.

On the other hand, in the cases at bar, according to the uncontradicted evidence, all orders for the merchandise involved herein were transmitted to the foreign manufacturer for its acceptance, and the purchase price was paid to the plaintiff as a collecting agency and by it paid to the foreign manufacturer, the latter freely offering the merchandise in question to all purchasers for export to the United States.

The evidence in this regard is corroborated by the following excerpt from the special agent's report (collective exhibit 9) which was offered in evidence by the Government.

Relationship

The New England Foil Corp. was stated to act as agent for the manufacturer. This importer takes care of collecting money from the various firms in the United States, advances customs duties and takes care of entries for the various other firms. All sales are made through the intermediary of this importer but Mr. Schupbacher stated that the manufacturer is free to deal directly with any United States firm and is not bound to sell exclusively to the New England Foil Corp. TheNew England Foil Corp. received a 1% commission on all sales made to the United States whether directly or through their intermediary.

It also appears from the said special agent's report that a 2 per centum cash discount was granted to all United States customers, and that all sales made to the United States were at c. i. f. New York duty paid prices, cost of packing being always included in said prices.

I am satisfied that these cases are on all fours with the case of *F. C. Gerlach & Co. et al.* v. *United States*, Reap. Dec. 5084, decided

by me on January 8, 1941. There, as here, the question involved was the dutiable value of certain aluminum foil, some of which was of .00035-inch gauge, as in the instant cases. Also, there, as here, counsel for the Government contended that the decision in *United States* v. *Massce & Co. et al., supra,* was controlling, but that case was held to be inapplicable.

Counsel for the plaintiff in their supplemental brief filed herein request that there be included in my findings the words "handling charges * * * as shown on the invoices * * *." This request must be denied for the reason that no "handling charges," as such, appear on the invoices herein.

On the other hand, counsel for the Government in a supplemental brief filed herein contends that there can be no export value where the merchandise is freely offered for sale to all purchasers for export to the United States, as in this case, at a price of $6.50 per ream of 260,000 square inches c. i. f. New York, which price included duty, and cites in support of such contention the case of *United States* v. *Zellerbach Paper Co.,* 28 C. C. P. A. 303, C. A. D. 159.

In my opinion, however, the cited case [C. A. D. 159] was concerned solely with foreign value, and for that reason is not here applicable. In its decision the appellate court said:

> It must be remembered that we are not here concerned with export value or any other value except "foreign value" and there is no contention made here (appellee contended otherwise before the single judge sitting in reappraisement) by either party that any other value but the foreign value was the proper dutiable value for the appraiser to adopt as the basis of his appraisement.

Upon all the facts and the law applicable thereto I find and hold:

1. That the imported merchandise at bar consists of certain aluminum foil of .00035-inch gauge, represented by items marked A or B and initialed F. C. G. on the invoices accompanying the entries covered by these appeals.

2. That said aluminum foil was imported from Switzerland during the months of January, February, March, and April, 1939, and was entered at the port of New York on the basis of export value.

3. That at the time of exportation of said merchandise there existed no foreign value for such or similar merchandise.

4. That at the time of the exportation of said merchandise there did exist an export value therefor which was a duty paid c. i. f. New York price, to wit, $6.50 per ream of 260,000 square inches, less 2 per centum cash discount; and also less freight, insurance, and consular fee, as those amounts are shown on the invoices; and less the duty included in the foregoing net result at the applicable rate or rates.

As to all other merchandise, the appeals are hereby dismissed. Judgment will be rendered accordingly.