UNITED STATES v. GOODHAND-GRAFMULLER, INC.

**No. 6004.**—Invoices dated Grenoble, France, June 17, 1939, etc.
Certified June 19, 1939, etc.
Entered at New York, N. Y., June 28, 1939, etc.
Entry No. 34286, etc.

(Decided May 10, 1944)

*Paul P. Rao*, Assistant Attorney General (*Daniel I. Auster*, special attorney), for the plaintiff.
*John D. Rode* for the defendant.

WALKER, Judge: These are appeals taken by the collector of customs from findings of value made by the United States appraiser at the port of New York on certain leather gloves exported from France during the period from August 1938 to November 1939. The merchandise was originally entered in French francs on the basis of foreign value. Within the time permitted by statute the entries were amended by adding thereto amounts equal to certain taxes levied on such goods when sold for home consumption in France. The merchandise was appraised on the basis of foreign value at the values thus shown on the entries, and within the time specified in section 501 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (T. D. 49646), these appeals were filed with the court by the collector of customs.

It is the contention of the plaintiff that (1) no foreign value, as that value is defined in section 402 (c) of the Tariff Act of 1930 as amended by the Customs Administrative Act of 1938, *supra*, existed for merchandise such as or similar to that in issue, or, alternatively, (2) if such foreign value existed it was lower than the export value as defined in section 402 (d) of the same act, *supra*, and (3) that an export value for such or similar merchandise did exist.

The applicable statutes read as follows:

SEC. 402. VALUE.

(a) BASIS.—For the purposes of this Act the value of imported merchandise shall be—

(1) The foreign value or the export value, whichever is higher;

\*        \*        \*        \*        \*        \*        \*

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

(d) Export Value.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

At the outset it may be said that the gloves denominated "La Tour" were conceded by the Government not to be involved in these appeals, which I construe to be an abandonment of the appeals insofar as they relate to such items.

With respect to the existence or absence of a foreign value for the remainder of the merchandise at bar, the evidence offered on behalf of the plaintiff consists of the following: First, the report of Clark E. Husted, American vice consul at Lyon, France, dated July 23, 1941, detailing the results of a visit he made on July 18, 1941, to the offices of Emile Perrin at Grenoble, France, the exporter of the merchandise herein. In the report, which was admitted in evidence as exhibit 2, Mr. Husted states that he examined the records of the company and interviewed a Mr. Guillard, identified as the manager thereof, and Mr. Perrin. On page 2 of the report the following is said:

The prices declared on the invoices were declared to be the prices for home consumption although a search of the records reveals that only in a few cases which will be cited, was there any sale of comparable merchandise in France. The manufacturers maintain that during 1938–1939, 75% of the volume of their business was with the United States, 15% was for export to other countries than the United States, and 10% was for home consumption.

The American market is different from the other markets served and the styles of gloves sold in America were not in demand elsewhere with rare exceptions. The majority of the gloves made for the American market are of the novelty or specialty varieties. The manufacturers do not carry a stock of gloves for the American market because of the radical and swift style changes. Occasionally the agent orders in small quantities for its own stock. The gloves are made almost entirely to order.

Whether the statement that—

The American market is different from the other markets served and the styles of glove sold in America were not in demand elsewhere with rare exceptions.

is Mr. Husted's own conclusion, or whether it was a report of what was said to him by either Mr. Guillard or Mr. Perrin, is difficult to determine from the context of the report. However, under the provisions of section 402 (c), *supra*, the inquiry is not whether there was any *demand* for merchandise such as or similar to that in question, but whether or not it was freely offered for sale. Implicit in the finding of value made by the appraiser is also a finding that it was freely offered for sale, and I am satisfied that the quoted statement can have no pro-

bative value in determining the issue raised in regard to such finding.

Later Mr. Husted says in his report:

Grenoble, it may be said, is the principal market in France for kid gloves. Almost the only glove which can be used for purposes of comparison of the prices in France and export prices is a slipon 4 button p. k. in kid. (Sometimes the words saxe or sac are used instead of slipon and sometimes the words plain or staple are added to the appellation; unless the words fancy or novelty are appended, it is substantially the same. glove.) The firm of Emile Perrin gives this kind of glove the name La Tour Four, No. 1872. Variations of the glove are, however, given other numbers although there is no radical difference in the glove and examples are given below of prices quoted Goodhand-Grafmuller and prices quoted to French customers on this type of glove. All examples have been verified from the company's books, vouchers of payment and commercial invoices.

Now, although the La Tour glove is conceded not to be involved in these appeals, the numbers which Mr. Husted gives as being variations of the La Tour and having no radical difference from it, namely, Nos. 608, 626, 630, and 689, are involved in these appeals. As to each of these, Mr. Husted states, apparently based upon his examination of the records as detailed above, that they were sold to buyers in France. Furthermore, the four numbers given above are said to be *examples* of cases where prices were quoted to the importer and to buyers in France, and it nowhere appears that they were the only numbers so quoted.

From the foregoing it appears that the report marked exhibit 2 does not go into the question of *offers* for sale, but treats only of actual sales, and, in fact, as to these, is self-contradictory and indefinite. In my view, therefore, it is valueless as evidence upon which a finding as to the existence or nonexistence of foreign value might be made, and I therefore decline to accord it any weight in the determination of that question.

The other class of evidence relied upon by the plaintiff to establish nonexistence of a foreign value for the merchandise in issue consists of statements made by the exporter on the consular invoices in eight of the entries at bar, covered by Reappraisement Nos. 136372-A to and including 136379-A.

It appears that, excluding the La Tour type of glove, there were 319 style numbers shipped to the importer herein and involved in these appeals. The statements relied upon by the plaintiff cover 143 of such numbers and are couched in the following language:

I also certify that merchandise the same as or similar to that described in the second paragraph of this invoice is not sold or offered for sale in France for home consumption, and that the merchandise is made solely for export.

It also appears that at least one of each of the 143 numbers referred to above is covered by each of the 31 remaining appeals, and that on the consular invoice in such cases a statement couched in the following language appears:

\* \* \*. That merchandise the same as or similar to that described in this invoice is freely offered for sale in France and is ordinarily sold for home consumption to purchasers classified for the purpose of the French fiscal reform law as "producers." That the prices at which such sales are made to "producers" on the date of the exportation are no higher than the invoice prices.

While the reason, if there be any, for making such conflicting statements on the invoices is not explained in the affidavit of the exporter received in evidence as exhibit 19, the statements relied upon by the Government are contradicted therein. Citing *Lulis Corp.* v. *United States*, Reap. Dec. 3025; *A. J. Bracher Co., Inc.* v. *United States*, Reap. Dec. 3045; *Max Spiegel Sons Co., Inc.* v. *United States*, Reap. Dec. 3309; *Gallagher & Ascher, Inc., et al.* v. *United States*, Reap. Dec. 3350; *United States* v. *A. J. Bracher Co., Inc., et al.*, Reap. Dec. 3392; and *United States* v. *American Accordions, Inc.*, Reap. Dec. 4959, it is argued by the Government that "statements on the invoices duly acknowledged before the American consulate by the exporter, made at the time of exportation, merit more probative value than statements made by the same affiant in subsequent affidavits while litigation is pending."

While not denying the logical and legal correctness of the proposition argued by the Government, it does appear that the invoice statements relied upon cannot, standing alone as they do, and without considering exhibit 19, be considered such evidence as would overcome the presumption of correctness attending the action of the appraiser. They were before the appraiser at the time he made his appraisement and his action was contrary to their import. The rule in such cases is that the presumption in favor of the correctness of official action must prevail over contrary invoice statements when the latter are supported by no other evidence. Cf. *United States* v. *Ocean Brokerage Co.*, 11 Ct. Cust. Appls. 38, T. D. 38648, for an analogous situation.

I conclude, therefore, that the plaintiff has failed to establish the absence of a foreign value in the case of the merchandise in issue, and proceed to a determination of the question of whether an export value therefor existed, and, if so, whether it was higher than the foreign value.

It is the contention of the plaintiff that while the importer herein, the defendant, was the sole agent in the United States of the exporter, it acted as such only in a fiscal and order-gathering capacity, and that the goods were freely offered for sale to all purchasers in Grenoble, the principal market for such merchandise in France, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States at prices higher than the foreign values thereof.

It appears that the arrangement between the importer and the exporter was never committed to writing. Concerning it, one of the parties, the exporter, Emile Perrin, says in his affidavit, exhibit 19:

* * *. I am well acquainted with the relationship existing between my firm and Goodhand-Grafmuller, Inc. I am personally familiar, moreover, with all of the leather gloves shipped by my firm to Goodhand-Grafmuller, Inc., during all the years the said firm has been the sole agent in the United States for Gant Emile Perrin. I am personally familiar with all of the leather gloves shipped by my firm to Goodhand-Grafmuller, Inc., between August 5, 1938, and November 22, 1939, inclusive, and which are covered by the following shipments:

(Here follows a list of the 39 shipments here involved.)

From approximately the year 1925 until the present time and, therefore, during the period covered by the above-listed shipments, the firm of Goodhand-Grafmuller, Inc., has been the sole agent in the United States for Gant Emile Perrin. My firm, during all this period of more than 15 years, has shipped leather gloves to Goodhand-Grafmuller, Inc., in two ways. First, the firm of Goodhand-Grafmuller, Inc.. purchases from my firm leather gloves for its own stock. As to such leather gloves, my firm has no other interest after the gloves are shipped and the purchase price paid. Second, the firm of Goodhand-Grafmuller, Inc., receives leather gloves from my firm on consignment. In such instances, after the gloves are cleared through the United States customs and the duty and other charges paid by Goodhand-Grafmuller, Inc., they are sold by Goodhand-Grafmuller, Inc., to various firms and individuals throughout the United States. After such gloves are sold, the purchase price paid by the purchasers in the United States, less duty, charges, and commission of Goodhand-Grafmuller, Inc., is remitted to my firm in France.

The firm of Gant Emile Perrin does not and will not ship gloves to anyone in the United States except Goodhand-Grafmuller, Inc. Furthermore, gloves made by my firm are not freely offered for sale to all purchasers in the principal markets of France for exportation to the United States. In rare instances my firm has received orders in Grenoble for gloves to be shipped to Goodhand-Grafmuller, Inc., in the United States from buyers from various concerns in the United States who agree to purchase the gloves after importation into the United States. The receipt of such orders has only been done with the knowledge and consent of Goodhand-Grafmuller, Inc., and as an exceptional matter not in the ordinary course of trade. Such instances have occurred in less than 1 per centum of any sales by Gant Emil Perrin, either as to quantity or number of sales. In view of my agreement with Goodhand-Grafmuller, Inc., my firm is not free to sell to anyone in the United States except Goodhand-Grafmuller, Inc., without their consent. Even in such instances the gloves are always shipped to Goodhand-Grafmuller, Inc., and sold after importation into the United States.

No contractual relationship of any kind exists between my firm and customers of Goodhand-Grafmuller, Inc., in the United States. Until the gloves shipped by my firm to Goodhand-Grafmuller, Inc., on consignment are actually accepted by their customers in the United States, the title to said gloves remains in Gant Emile Perrin and the gloves may be disposed of in any way desired by my firm or by Goodhand-Grafmuller, Inc., acting as my agent.

The president of the other party to the arrangement, the importing corporation, testified that it was his understanding that the importer had the sole selling right of Perrin's goods, and controlled the sale, and that Perrin was not free to sell to anyone in the United States without the importer's permission and consent. In the years 1938 and 1939 only 3 per centum or less of all the gloves Perrin sold for exportation to the United States were the result of orders placed in

Grenoble, he said, and every such order was to a customer of the importer and was subject to its confirmation.

From the foregoing it might be inferred that no sales of goods for exportation to the United States were ever made in Grenoble; that selections were made there, but that the actual sales transactions took place at Goodhand-Grafmuller's establishment in New York City. However, the question is not where the sales transactions took place, but where the offers were made, and it does appear that offers were made in Grenoble.

Plaintiff offered evidence, both by affidavit and orally, to the effect that buyers representing large American stores made personal calls at the Perrin factory in Grenoble and there placed orders for gloves such as or similar to those in issue, and that these were subsequently delivered to their principals in the United States. Such deliveries were invariably made through Goodhand-Grafmuller, Inc., the defendant herein, and the orders were subject to the latter's approval.

It appears to be undisputed that title to the goods in such cases, as well as in the cases where goods were ordered by Goodhand-Grafmuller, Inc., for American customers, remained in Gant Emile Perrin at least until the goods were dispatched to the customer by Goodhand-Grafmuller, Inc., and that the latter was not responsible for any loss incurred or for nonpayment of the price by the customer. Payments were made in dollars by the customers to bankers representing Goodhand-Grafmuller, Inc., who, in turn, remitted to Perrin, less its commissions.

Prices for goods sold to American customers were fixed by joint agreement of Perrin and Goodhand-Grafmuller, Inc., except that in cases where competition was keen the latter had some leeway to make a salable price, although Perrin could accept or reject the new price for future orders, but the loss on the sale at which the price was made was borne by Perrin.

It is the defendant's contention that such offers as were made in the home market for exportation to the United States were not freely made, and were not made in the ordinary course of trade. In this connection evidence was offered indicating that Goodhand-Grafmuller, Inc., exercised a control over the offers made in Grenoble both as to the persons to whom they would be made and the merchandise which would be made available.

Plaintiff contends that the control exercised by Goodhand-Grafmuller, Inc., extended only to determining that there was no duplication of selections previously reserved for a particular American customer in a given American city. In my view, however, the record establishes that Perrin transferred to Goodhand-Grafmuller, Inc., the exclusive right to offer his (Perrin's) merchandise for sale for exporta-

tion to the United States, divesting himself entirely of the right to do such business, and conducted his business in Grenoble on that basis.

Each of the witnesses who testified that he or she had visited the Perrin factory at Grenoble and there ordered gloves was shown to have been a representative of a customer of Goodhand-Grafmuller, Inc., and to have been preceded or accompanied by a letter of introduction to Perrin from Goodhand-Grafmuller, Inc. There is no evidence that Perrin offered his merchandise to anyone else and it is clear that in any event no offer was binding until confirmed by Goodhand-Grafmuller, Inc. Under these circumstances it cannot be said that there was a free offer to all purchasers as required by the formula for export value in section 402 (d), *supra*, and I therefore hold that there was no export value within the meaning of that provision for the merchandise at bar.

In the foregoing respect, at least, the case at bar differs from the cases cited by the Government in support of its position, viz, *Robinson & Co. et al.* v. *United States*, 13 Ct. Cust. Appls. 644, T. D. 41486; *New England Foil Corp.* v. *United States*, 8 Cust. Ct. 630, Reap. Dec. 5591; and *F. C. Gerlach & Co. et al.* v. *United States*, 6 id. 710, Reap. Dec. 5084. In all of those cases the foreign manufacturer was free to deal directly with buyers desiring to purchase for exportation to the United States.

There is a further reason for holding that an export value has not been established for the merchandise involved in this case. The burden was on the plaintiff to establish that the merchandise in issue was freely offered for sale to all purchasers in the principal markets of the country of exportation under the terms set forth in the formula for export value in section 402 (d), *supra*. It was established that not all of Perrin's gloves were offered for the reason that some styles, not identified by the record, were reserved to individual purchasers within certain areas, and no one else from those areas was permitted to purchase those styles. Since these areas were generally large American cities and the purpose of the reservation was to prevent competition in those styles, it is obvious that the denial of the opportunity to purchase the same to other buyers was a substantial matter. Under the circumstances, I am of the opinion that it was the plaintiff's burden in sustaining its case to establish which, if any, of the style numbers here involved were not so restricted. This it failed to do.

On the record before me I find that foreign value, as defined in section 402 (c) of the Tariff Act of 1930 as amended by the Customs Administrative Act of 1938, was the correct basis of value for the merchandise in issue, and that such value, in each case, was the appraised value.

Judgment will issue accordingly.