T. W. HOLT & CO. *v.* UNITED STATES

**No. 7714.—**
Entry Nos. CE 1238; CE 81.

First Division, Appellate Term

(Decided July 11, 1949)

*Arthur J. Gutman* (*John F. Kavanagh,* associate counsel) for the appellant.
*David N. Edelstein,* Assistant Attorney General (*Samuel D. Spector,* special attorney), for the appellee.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: We are required in this proceeding to review the decision of Cline, J., 20 Cust. Ct. 367, Reap. Dec. 7523, holding foreign value, section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U. S. C. § 1402 (c)), to be the proper basis for reappraisement of merchandise imported from Cuba, and such statutory value to be the appraised value.

Appellant, plaintiff below, has assigned 14 errors. Our conclusion disposes of all but we deem it unnecessary to discuss each separately.

The articles in question are so-called "special" type brooms, which are superior in workmanship and materials to the "regular" type that is not exported to the United States. Three different kinds, i. e.,

4-string, 5-string, and 6-string, were included in the shipments under consideration. All were entered at the invoice prices, being the purchase prices, claimed by appellant to be dutiable export value, section 402 (d) of the Tariff Act of 1930 (19 U. S. C. § 1402 (d)), and the proper basis for appraisement. Higher values were adopted by the appraiser in his official action as aforesaid.

The trial judge prepared a clear, concise, and correct review of the evidence. It is quite sufficient for our purpose.

That the prices at which these "special" type brooms were sold in the foreign market for home consumption at the time of exportation of the present merchandise, were higher than those at which the brooms were sold for export to this country, is clear. The primary question for determination is: Did all the elements embodied in the statutory definition of foreign value, section 402 (c), as amended, *supra*, prevail in the sales in the foreign market for home consumption of the said "special" type, at the time of exportation of the merchandise under consideration?

The trial court answered the question in the affirmative and sustained the appraised values. In doing so, the preponderance in weight of the evidence was given to the list of sales (exhibit B) reported in defendant's (appellee's) collective exhibit 4, which the court found to be sales "in the home market in quantities of 1, 2, and 3 dozen at prices corresponding to the appraised values."

In attacking this conclusion, appellant contends that all of the sales in the home market, reported in said collective exhibit 4, and pertinent to the present discussion, were made "to consumers or to retailers in what is perfectly obvious were *small retail quantities*," and none were made to wholesalers. Counsel for appellant, in his brief, through reference to the record, supplies reasons therefor in this way:

 * * * This evidence, Exhibit #3 [letter from the American Embassy in Havana, Cuba] explains why there are no wholesale dealers in Cuba in brooms, because when a wholesaler in any merchandise buys from the Cuban manufacturer he has to pay a 7.2% tax, and when the retailer buys from the wholesaler he, too, has to pay a 7.2% tax.

 * * * There was also a tax known as the Cuban sales tax which amounted to 2.75% and was assessed every time merchandise changed hands. This was an additional reason for Cuban consumers and Cuban retailers to by-pass the wholesaler, thereby saving the payment of the 2.75% tax in addition to saving the 7.2% tax. No wonder the Special Agent had great difficulty in finding wholesale dealers in brooms in Cuba, for under that tax situation wholesalers would have a hard time getting customers.

The explanation clearly shows that the ordinary course of trade in the principal market of Havana at the time of exportation of these brooms was for the manufacturer to sell to purchasers, who, like grocery stores, sold to the ultimate consumer, or like a hospital, used the brooms. That such purchasers may be referred to as "retailers"

or even "consumers" is not the criterion in finding dutiable value. "The law is not concerned with the persons who buy, but the manner in which they buy." *United States* v. *Richard & Co.*, 15 Ct. Cust. Appls. 143, 147, T. D. 42216.

At this point, it is important to emphasize, in view of some argument by appellant, that, for the purposes of this case, it is the ordinary course of trade in the country of exportation that is controlling. What the Office of Price Administration, an emergency set-up in this country, did during the war period to regulate trade and commerce within the United States is immaterial to this discussion.

*United States* v. *T. E. Ash et al.*, 22 C. C. P. A. 395, T. D. 47401 [see also *Same* v. *Same*, 23 C. C. P. A. 360, T. D. 48211], cited in counsel's brief as "authority for the proposition that where the only market in the country of exportation consists of sales in retail amounts, the Court properly ignores such sales and holds there is no foreign market value upon which to base dutiable value," does not support appellant's contention. In that case, the merchandise consisted of so-called "torsion balances" and "magnetic field balances," all scientific instruments that were principally used in the state of Texas for locating oil deposits. Because Germany, the country of exportation, had only few oil wells and the districts had long ago been thoroughly explored, there existed no demand or market therein for these field balances for use by oil producers or for exploration. The highly technical character of the instruments made it necessary for experts to explain to users the mechanism and the method of handling same. For this reason, manufacturers refused to sell to dealers for resale, but restricted sales to one class of purchasers, i. e., individual consumers that were either educational or scientific institutions. It was the failure to freely offer the merchandise to all purchasers in the foreign market for home consumption that negatived the finding of statutory foreign value, and not because "of sales in retail amounts," as appellant argues. For complete history of the case, see *T. E. Ash et al.* v. *United States*, Reap. Circ. 1850; *United States* v. *T. E. Ash et al.*, Reap. Circ. 2115; *T. E. Ash et al.* v. *United States*, Reap. Circ. 3119; *T. E. Ash et al.* v. *United States*, 65 Treas. Dec. 1603, Reap. Dec. 3250; *United States* v. *T. E. Ash et al.*, 22 C. C. P. A. 395, T. D. 47401; and *T. E. Ash et al.* v. *United States*, 67 Treas. Dec. 1400, Reap. Dec. 3549, affirmed in *United States* v. *T. E. Ash et al.*, 23 C. C. P. A. 360, T. D. 48211.

Appellant also cites *G. W. Pleissner* v. *United States*, 16 Ct. Cust. Appls. 507, T. D. 43237; *United States* v. *A. W. Faber, Inc.*, 21 C. C. P. A. 290, T. D. 46817; and *United States* v. *Minkus*, 21 C. C. P. A. 382, T. D. 46912, as supporting the claim that no foreign value existed for the merchandise under consideration.

The conclusion in the *Pleissner* case, *supra*, which concerned the usual wholesale quantity of woolen cloth from Germany, was based on established facts showing that the usual wholesale quantity was 100 meters per color, and that shorter lengths were not wholesale quantities in the ordinary course of trade.

The sole question in the *Faber* case, *supra*, was whether there should be considered as part of dutiable foreign value a 5 percent discount allowed only to those whose aggregate purchases per year reached a specified minimum amount. Sales to retailers were eliminated from all consideration because they were in less than the usual wholesale quantity. Although it was shown that the majority of purchasers in the usual wholesale quantities and in the ordinary course of trade received the 5 percent discount, the item was held not to be part of statutory foreign value because it was not included in a price that was offered to all purchasers, but applied only to a particular class.

The *Minkus* case, *supra*, involved miniature dictionaries which were shown to have been freely offered for sale in quantities varying from less than 25 to 10,000, with discounts ranging from 33⅓ percent to 75 percent. Without making a positive finding due to lack of definite proof, the appellate court laid down the principle that in a market where sales of a commodity are made in different wholesale quantities, the usual wholesale quantity is that at which the major part of such sales is made.

None of the three cases just reviewed is pertinent to the present situation. Each related to a condition materially different from that before us. Hence, the principles of law invoked therein have no application here.

Appellant's proof on the matter of the usual wholesale quantity in sales in the Cuban market for home consumption consists of testimony offered by the importer, stating it was his understanding that 25 dozen brooms was such quantity. The conclusion, unsupported by sales records of any kind, and appearing in the present record as being based on what the witness was told by "a very large wholesale firm located in Pinar del Rio," has little, if any, evidentiary value, in the light of the customs agent's report, with tabulation of sales attached thereto, defendant's (appellee's) collective exhibit 4. Referring to sales for home consumption in Cuba, the report states that the present merchandise is freely offered and sold to all purchasers, and "There are no restrictions or concessions regarding the quantity which may be purchased or as to the class of buyer." Examination of the said tabulation reveals sales in the home market of merchandise, like that under consideration, in quantities of 1, 2, and 3 dozen, at prices equivalent to the appraised values. The trial judge gave the evidence found in the report, collective exhibit 4, *supra*, controlling influence in determining the element of usual wholesale quantities as applicable

to dutiable foreign value, a conclusion which is also adopted herein. *Jenkins Brothers* v. *United States*, 25 C. C. P. A. 90, T. D. 49093.

Appellant also raises the question of comparability of the "special" brooms sold in the foreign market for home consumption and those sold for export to the United States. Relying on information embodied in the customs agent's report, exhibit 5, it is contended that the products sold in the two different markets are not similar for tariff purposes. This report discloses that the "special" brooms sold in the foreign market for home consumption and those sold for export to the United States are identical, except for the special attention given to the selection of wooden handles for the ones exported to this country. Each class of articles contains a better grade wooden handle, with better finish, selected and dyed broom corn, and more careful workmanship. All are used for the same purpose and the cost of production of the two classes is approximately the same. Although both are practically identical in the different categories just outlined, they were not regarded as commercially interchangeable, a conclusion set forth in said report as follows:

With regard to the question "are they used for the same purpose and commercially interchangeable?", Mr. Rodriguez [general manager hereinabove referred to] stated that the different types of brooms are used for the same purpose, i. e., sweeping floors, but they would not be commercially interchangeable.

This quotation in said exhibit 5, appellant argues, is sufficient for a finding that the articles are dissimilar for customs purposes. With such contention, we are not in accord.

The matter of similarity of imported merchandise with a comparable product sold for home consumption in the foreign market has been the subject of much litigation both in this court and in the Court of Customs and Patent Appeals. *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714, construed the word "similar," as used in section 402 of the Tariff Act of 1930, as follows:

In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they·are similar, within the meaning of section 402 (b).

While the foregoing interpretation embraces several elements by which similarity for appraisement purposes may be determined, authorities discussed *infra*, have not required that all of the said items of comparison shall be present in deciding the issue.

*United States* v. *Kraft Phenix Cheese Corp. et al.*, 26 C. C. P. A. 224, C. A. D. 21, held imported "Portion" Roquefort cheese and so-called "Standard" Roquefort cheese, sold in the foreign market for home consumption, although used for the same purpose, to be dissimilar

upon a showing that each kind was subjected to different treatment, resulting in varying properties that permitted the "Portion" type to be cut into pieces but not the "Standard" brand.

Two kinds of rock candy, differing in the size of crystals and comparative merchantableness, were nevertheless held to be similar upon a finding that both were used for the identical purpose, were made by the exact method, had approximately the same value, and were identical in chemical composition. *Scharf Bros. Co.* v. *United States*, 16 Ct. Cust. Appls. 347, T. D. 43089.

*United States* v. *Vietor & Achelis*, 17 C. C. P. A. 412, T. D. 43864, held two types of ribbons to be dissimilar, the conclusion being based largely on the difference in value, approximately 20 percent, between the two classes of merchandise.

*United States* v. *Thomas*, 21 C. C. P. A. 254, T. D. 46788, is particularly in point. There, the issue of similarity related to paper tubes and bobbins from Czechoslovakia, used to hold yarn during the spinning, twisting, or warping processes in the textile industry. The Government contended that the goods sold in the foreign market for home consumption were not commercially interchangeable with, and therefore not similar to, the imported articles because differences in construction, consisting of variations in diameter, the number of corrugations, and degree of tapering at the base, prevented the tubes from fitting all spindles and made their use dependent upon the notion or idea of the individual textile manufacturer. In overruling the Government's contention and holding that commercial interchangeability was not an indispensable element for articles to be similar for tariff purposes, the court said:

* * * While the record shows that certain American manufacturers and Czechoslovakian manufacturers could not use on their particular spindles tubes having a taper not designed to fit the spindle of their machines, and that they would not accept, as a compliance with their orders, tubes made with a taper which did not fit, it also is shown that others, there and here, could use tubes with such a taper, and when used, all were used for the same purpose; that each of the compared articles is made from the same material, by the same processes, and when finished has no material differences which would render them dissimilar for valuation purposes. Whether goods sold in the foreign market are similar to those imported cannot always depend upon whether the foreign goods would be accepted as a compliance with an order by the user of the imported goods. That test might require that the goods be identical and the requirement of the statute is only that the goods be similar. Certainly the equality in value and similarity in cost of production, under the circumstances of this case, were very pertinent and material considerations in determining similarity.

The *Thomas* case, *supra*, was cited with approval in *Jordan Marsh Co.* v. *United States*, 22 Cust. Ct. 396, Reap. Dec. 7662, decided as recently as February 9, 1949.

*United States* v. *Wecker & Co.*, 16 Ct. Cust. Appls. 220, T. D. 42837, expressed very clearly the approach to be taken in considering the issue of similarity for valuation purposes. We quote therefrom:

\* \* \* The question of similarity is, in each case, to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions, is capable of the same use and may be substituted therefor, is available. Such an article is a similar article, notwithstanding the price, the methods of construction, and the component materials may be somewhat different; but, for all utilitarian purposes, one is a substitute for the other. It is in this sense, we believe, that the word similar was used in said section 402 (b).

In the present case, the proof is uncontradicted that the "special" brooms sold for export to the United States and those sold in the Cuban market for home consumption are substantially the same in construction, in value, and in use. Such characteristics of sameness between the two classes of articles render them similar for tariff purposes. It is fair to infer from the record before us that the term "commercial interchangeability," as reported by the customs agent, exhibit 5, *supra*, was used in the sense that the two types of brooms are not identical. But the requirement is not that goods be identical; the test of the statute is only that the goods be similar.

The holding of the trial judge that the "merchandise sold for home consumption was similar to that sold for export" is amply supported by fact and in law.

The importer (appellant), as the appealing party, assumed the burden of not only disproving the foreign value found by the appraiser, which carries a statutory presumption of correctness, 28 U. S. C. 1948 revision, § 2633, but also of establishing the correctness of the claimed export value. On the record before us, appellant has failed in its twofold obligation.

For reasons hereinabove set forth, we find as a matter of fact:

(1) That the merchandise in question consists of "special" type, 4-string, 5-string, and 6-string brooms imported from Cuba.

(2) That at the time of exportation of the brooms in question similar merchandise was freely offered for sale to all purchasers in the principal market of Havana, Cuba, in wholesale quantities and in the ordinary course of trade, both for home consumption and for export to the United States.

(3) That the prices for the merchandise so sold for consumption in the foreign market in the usual wholesale quantities of 1, 2, and 3 dozen, were higher than those at which the merchandise was sold for export to this country, such higher prices corresponding to the appraised values.

(4) That foreign value, section 402 (c), as amended, *supra*, is the basis for appraisement of the merchandise in question.

Accordingly, we hold as matter of law that the foreign values for the different kinds of "special" brooms under consideration are the appraised values.

The judgment of the trial court is affirmed.