INTERNATIONAL COMMERCIAL CO., INC., AND ARMOUR & CO. *v.* UNITED STATES

No. 7980.—

Entry Nos. 716286; WH 587.

(Decided April 4, 1951)

*Barnes, Richardson & Colburn* (*Albert MacC. Barnes, J. Bradley Colburn*, and *Eugene F. Blauvelt* of counsel) for International Commercial Co., Inc.

*Eugene R. Pickrell* (*Eugene R. Pickrell* and *Michael Stramiello, Jr.*, of counsel) for Armour & Co.

*David N. Edelstein*, Assistant Attorney General (*Daniel I. Auster, Guy Gilbert Ribaudo, Richard F. Weeks*, and *Joseph F. Donohue*, special attorneys), for the defendant.

CLINE, Judge: This case involves two appeals for reappraisement which were consolidated at the trial. The merchandise consists of canned corned beef, packed in 12-ounce tins of 48 tins per case, exported from Argentina on August 5, 1947, and October 17, 1947. It was invoiced, entered, and appraised as follows:

| Reap. No. | Invoice unit price | Entered value (foreign market value) | Appraised value (Export value) |
|---|---|---|---|
| 183740–A | $11.30 per case | 8.70 Argentine pesos per dozen tins, equal to $10.36 per case, net packed | $13.50 per case of 48 12-oz. tins, net packed |
| 184568–A | $13.00 per case | 8.45 Argentine pesos, per dozen tins, equal to $8.4296 per case, packing included | $14.50 per case, net packed |

The record consists of a stipulation of certain facts, the testimony of seven witnesses for the plaintiffs and three witnesses for the Government, and 73 documentary exhibits, 66 of which were offered by the plaintiffs and seven by the Government. (Two additional documents offered by the plaintiffs were withdrawn.)

In their brief, plaintiffs have raised objections to some of the exhibits offered by the Government, but these objections go to the weight rather than the admissibility of the evidence and have been considered by the court in preparing this decision.

The plaintiffs contend that no export value within the meaning of section 402 (d) of the Tariff Act of 1930 exists on the grounds that the exportation of canned corned beef was restricted and controlled by the Argentine Government; that the Argentine packers and not the "Instituto Argentino de Promoción del Intercambio" (Corporation for the Promotion of Trade, hereinafter called I. A. P. I.) were the sellers of the merchandise; that the Argentine packers, brokers, or dealers were not agents of I. A. P. I. nor was I. A. P. I. the agent of such packers, brokers, or dealers; and that the merchandise was not freely offered or sold in Argentina to all purchasers for export to the United States. The plaintiffs also contend that if an export value existed, then the appraised values include items not properly a part of such export value.

The defendant claims that the appraised values are the proper dutiable values of the merchandise and that said values are the export values as defined in section 402 (d) of the Tariff Act of 1930; that the exportation of canned corned beef from Argentina to the United States was not so restricted as to destroy the existence of an export value; that I. A. P. I. was the seller of the merchandise; that said merchandise was freely offered and sold by Compañía Sansinena S. A. (hereinafter called Sansinena) and Establecimientos Argentinos de Bovril, Ltda. (hereinafter called Bovril) to all purchasers for export to the United States; that the 20 per centum charge made by I. A. P. I. was a part of the price and neither an export tax nor a deductible charge; and that the appraised value cannot be computed by the use of a rate of exchange which was not certified in accordance with section 522 of the Tariff Act of 1930.

At the trial the parties stipulated as follows:

That the merchandise covered by the reappraisements here involved consists of first-grade canned corned beef, packed 48 tins of 12 ounces each per case, the Product of Argentina, and exported from Buenos Aires, the principal market of Argentina, to the United States on August 5, 1947 and October 17, 1947, respectively.

That from August 1, 1947 to December 31, 1948, inclusive, the following concerns in Argentina engaged in the production of such or similar canned corned beef did not freely offer such or similar canned corned beef for export to the United States.

Compania Swift de La Plata, S. A.
Frigorifico Armour de La Plata, S. A., and S. A.
"La Blanca" (subsidiaries of Armour & Co., Chicago, Illinois.)
Wilson & Cia., S. A. Ind. Y. Com.
Corporacion Argentina de Productores de Carnes
Liebig's Extract of Meat Co., Ltd.
Soc. Anon. Frigorifico Anglo

That from August 1, 1947 to December 31, 1948, inclusive, H. J. Baker & Bros., 271 Madison Avenue, New York, N. Y. had a written contract dated July 5, 1938 with another concern manufacturing such or similar canned corned beef in Argentina, to wit, Compania Sansinena, a copy of which contract is annexed, or it is agreed may be subsequently offered in evidence and made a part of this stipulation. H. J. Baker & Bros., during the said period, sold in the United States such or similar canned corned beef produced by Compania Sansinena. Said Compania Sansinena, during the said period, produced such or similar canned corned beef in Argentina, which merchandise was sold to others in the United States.

That subject to rulings of the court, it is agreed that for the purpose of showing the ordinary course of trade and the method of doing business by said Compania Sansinena, in the sale or offer for sale of first-grade canned corned beef manufactured by it such or similar to that involved herein, any party may offer evidence respecting sales and/or offers for sale of such or similar merchandise, manufactured by the said Compania Sansinena S. A. and exported to the United States during the entire period, August 1, 1947 to December 31, 1948, inclusive.

That the appraisement herein of the merchandise involved in both the consolidated appeals to reappraisement was based upon prices at which similar canned corned beef manufactured by the said Sansinena was sold for export to the United States on the respective dates of exportation of the two involved shipments.

That subject to ruling of the court, copies or photostats of the invoices, entries and bills of lading covering the two shipments on which the appraisements were based herein, to wit:

> In the case of Appeal No. 183740–A—
> San Francisco Entry No. 2082, Consular
> Invoice No. 5755, Corrected Invoice
> No. 6713.
>
> In the case of Appeal No. 184568–A—
> Philadelphia Warehouse Entry No. 1254,
> Consular Invoice No. 6691

may be offered and marked in evidence herein.

That if the court shall hold that at the time of exportation of the merchandise covered by the said appeals to reappraisement herein, export values existed for such or similar merchandise within the intent and meaning of Section 402 (d) of the Tariff Act of 1930, then it is agreed, subject to the approval of the Court, that the appraised unit values less such deductions, if any, as the court may find upon the record herein made, to be not properly a part of such export value, represent the export values under the statute for the merchandise covered by these two appeals only.

That the said appraisements in both the consolidated appeals were based upon the full f. o. b. prices of similar merchandise produced by said Sansinena, and included the following charges in addition to the per se price of the merchandise covered by Reappraisement No. 183740–A/09165:

    (a)  Cartage to steamer
    (b)  Charge for placing merchandise on board vessel
    (c)  Statistical Charge
    (d)  Loading Permit Charge
    (e)  Bill of Lading Stamp
    (f)  Consular Fee
    (g)  Cost of Packing
    (h)  Export Sales Tax of 1.25% of the total f. o. b. Buenos Aires value of such merchandise
    (i)  Export Permit Tax
    (j)  A Charge of 20% upon the full f. o. b. Buenos Aires value of the merchandise imposed upon exportation by I. A. P. I., that being the Argentine organization, the name of which is made clear by the record,

and included the following charges in addition to the per se price of the merchandise covered by Reappraisement No. 184568–A/12125:

    (a)  Placing on Board Vessel
    (b)  Statistical Charge
    (c)  Loading Permit
    (d)  Bill of Lading Stamp
    (e)  I. A. P. I.'s Trade Charge
    (f)  Consular Invoice
    (g)  Cost of Packing
    (h)  Sales Tax on f. o. b. Value
    (i)  Export Permit

That on the respective dates of exportation of the merchandise involved herein, such merchandise was freely offered for sale and sold to all purchasers in Buenos Aires, the principal market of Argentina, in usual wholesale quantities and in the ordinary course of trade for home consumption in Argentina, at the prices listed below, which prices included the cost of all containers and coverings of whatever nature and all other costs, charges and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

In the case of Appeal No. 183740–A—
at 8.70 Argentine pesos per dozen 12
ounce tins, net packed.

In the case of Appeal No. 184568–A—
at 9.00 Argentine pesos per dozen 12
ounce tins, net packed.

\*     \*     \*     \*     \*     \*     \*

That the invoice extract and entry covered by Appeal No. 183740–A of International Commercial Co., Inc. covered one case only of canned corned beef extracted from an importation of such merchandise by that company under Entry No. 716285, Consular Invoice No. 5401. A copy of said Entry No. 716285 and of said Consular Invoice No. 5401, subject to the ruling of the court, may be admitted in evidence and marked as exhibits herein.

That the invoice extract and entry covered by Appeal No. 184568–A of Armour & Co. covered 5 cases only canned corned beef extracted from an importation of such merchandise by that company under Entry No. 2628, Consular Invoice No. 6621. A copy of said Entry No. 2628 and of Consular Invoice No. 6621, subject to the ruling of the Court, may be admitted in evidence and marked as exhibits herein.

The first point to be considered is whether the exportation of canned corned beef from Argentina was so restricted or controlled that no export value existed.

The following situation is revealed by the oral and documentary evidence herein. On May 28, 1946, Decree-Law No. 15.350/46 of Argentina was issued, establishing I. A. P. I., as an independent Federal agency with technical and commercial functions. The object of I. A. P. I. is to promote the development of domestic and foreign trade. It has various powers, including authority to buy, sell, and deal in all kinds of property; to store either its own merchandise or that of other persons in warehouses; to carry out for account of third parties all kinds of transactions within the scope of its activities; to carry out all transactions or purchases which the executive power may order in the interests of production; without taking a direct risk in the transaction, to buy and sell foreign exchange derived from the export of certain products.

On August 6, 1946, the Argentine Congress approved a law (No. 12830) vesting in the executive power general authority over raw materials, manufactured articles, and living and working conditions, including power to fix prices, to establish rules for the rationing and regulation of the manufacture, transportation, supply, use, distribution, and consumption of articles, and to prohibit or restrict exportation of products when required by the needs of the country.

Pursuant to this law, on August 23, 1946, the President of Argentina issued a decree providing that only those requests for leave to export certain specified commodities (not including canned meat) shall be considered as are presented to I. A. P. I., which shall "take charge of the placing abroad of the exportable surpluses of such productions," and that the Secretary of Industry and Commerce may amplify the list of specified commodities. Canned meats were included in the said list by resolution No. 6.807/46 issued by the Secretary of Industry and Commerce on August 27, 1946.

On October 7, 1946, the Central Bank of the Argentine Republic issued a circular stating that negotiation for exchange arising from exports of certain articles (including canned meat) would be made at the basic buying rate of 335.82 pesos per $100 United States currency.

After the issuance of resolution No. 6.807/46, the packers in Argentina advised prospective purchasers that all sales of canned corned beef for export would be subject to the approval of I. A. P. I. Discussions ensued between representatives of the packers and representatives of I. A. P. I. as to the restrictions to be placed on the exportation of canned meat. No formal rulings were issued by I. A. P. I.; all directives were verbal, but nonetheless binding upon all packers. At first, I. A. P. I. notified all packers that it would buy

all canned meats produced in excess of the quota purchased by the British Government and resell under its own name and on its own behalf. The packers protested and I. A. P. I. notified them early in 1947 that they would be permitted to sell canned corned beef for export at $14.50 f. o. b. per case, of which 30 per centum would have to be paid to I. A. P. I. The packers again protested, stating that the product could not be sold at such a high price. Thereafter, in July 1947, I. A. P. I. notified the packers that they would be permitted to sell canned meats, including canned corned beef, for export to the United States, at the best price possible, upon condition that a charge of 30 per centum of the f. o. b. price be paid to I. A. P. I. After further protests, on July 18, 1947, I. A. P. I. advised the packers that sales for export would be permitted, provided that all sales for export to the United States be made in dollars; that details of each sale be submitted to I. A. P. I. for approval of the price, terms, quantity, and purchaser; that dollar proceeds be paid either directly to I. A. P. I. or, if payment were made to the packer, that the draft or other form of payment be immediately endorsed over to I. A. P. I.; that in the case of canned corned beef, 20 per centum of the net f. o. b. selling price be retained by I. A. P. I.; that the balance remaining after deduction of the I. A. P. I. charge and the export sales tax be paid to the packer by I. A. P. I. in the form of Argentine pesos converted at the rate of 335.82 pesos per $100.

During this period there had been an embargo on the importation of canned corned beef and other canned meats into the United States, but that embargo was lifted in July 1947.

In order to cover the 20 per centum charge imposed by I. A. P. I., the packers calculated that an addition of a factor of 25 per centum to their sales prices of canned corned beef packed ready for shipment to the United States, including all expenses to put the merchandise on board ship, would be necessary in order for them to receive the same net amount. The packers are willing to sell ex plant without the addition of the factor of 25 per centum, but, for the convenience of buyers, to save them the necessity of making arrangements with I. A. P. I., moving the merchandise from plant to ship, and complying with Argentine export controls, it is the customary trade practice to quote prices on an f. o. b. Buenos Aires basis. It has been understood by the packers and the purchasers that the f. o. b. prices include not only the price of the merchandise itself but also all charges and expenses to place the goods on board the vessel and the 20 per centum charge imposed by I. A. P. I. at the time of exportation. In the case of f. a. s. sales, made by Sansinena and Bovril, the prices were quoted in Argentine pesos and included the cost of transportation from plant to steamer. They did not include the 20 per centum levy imposed by I. A. P. I. The purchaser was required to make all

arrangements with I. A. P. I. and to take the necessary steps to comply with Government export regulations.

When an agreement has been reached between the packer and the purchaser, a statement of the details must be submitted by the packer to I. A. P. I. on a form prescribed and approved by I. A. P. I. Purchasers understand that all offers are subject to approval by I. A. P. I. If I. A. P. I. refuses to approve the transaction, that is the end of it. Permission to export has at times been denied on the ground that the prices were too low. If approval is given, the I. A. P. I. stamp is placed on the form. The statement is then filed with the Secretary of Industry and Commerce in order to obtain an export permit. In addition, the packer must obtain a loading permit approved by the National Meat Board, by I. A. P. I., and by the Secretary of Industry and Commerce, and a certificate of embarkation issued by the Ministry of Finance. The loading permit is checked by customhouse officials and forwarded to the Central Bank of the Argentine Republic for exchange control purposes. A report of the shipment is required to be made by the packer and filed and approved by the National Meat Board.

When these requirements have been met, the packer makes out an invoice on I. A. P. I.'s billhead with its own name included, and a second invoice on its own billhead. These invoices, together with the shipping documents, are sent to I. A. P. I., which forwards the first invoice and the shipping documents to the purchaser. When the goods are placed on board the vessel, the packer advises the purchaser so that it may issue a draft or other form of payment payable or transferable to I. A. P. I. I. A. P. I. deducts from the invoice amount its charge of 20 per centum and the export sales tax of 1.25 per centum and pays the packer the balance converted at the official rate of 335.82 pesos per $100.

It is apparent from the foregoing that sales of canned corned beef from Argentina for export to the United States were subject to certain restrictions. The question before the court is whether the restrictions were such that the merchandise could not be freely offered and sold to all purchasers for export to the United States within the meaning of section 402 (d) of the Tariff Act of 1930.

In *Goodyear Tire & Rubber Co.* v. *United States,* 11 Ct. Cust. Appls. 351, T. D. 39158, the Canadian manufacturer controlled the distribution, sale, and price of the merchandise from the time it left the factory until it reached the ultimate consumer. It was distributed by 13 or 14 agencies and a limited number of jobbers and dealers whose operations were restricted to certain districts. The prices at which jobbers might sell to dealers and dealers to consumers were fixed by the manufacturer. There was evidence that hundreds and perhaps thousands of dealers were refused the privilege of purchasing

and selling Goodyear tires and that the manufacturer reserved the right to withdraw the privilege of buying and selling the merchandise in case the conditions imposed by the company were not complied with. Under these circumstances, it was held that there was no price in the Canadian market at which Goodyear tires were freely offered and sold to all purchasers in the usual wholesale quantities and that the appraisement based on the price paid by the dealers in Canada was void.

In the instant case, I. A. P. I. did control prices to some extent and required that every transaction have its approval. However, there were no restrictions on the resale or use of the merchandise. While the requirements stated by I. A. P. I. included approval as to price, terms, quantity, and purchaser, the only evidence of a rejection of a sale by I. A. P. I. is the statement in the affidavit of Earl Williams, general representative of Armour & Co. (plaintiffs' collective exhibit 31), that I. A. P. I. had at times denied permission to export canned corned beef on the ground that the f. o. b. prices were too low. It would appear, therefore, that I. A. P. I. was mainly interested in fixing prices, in getting its 20 per centum charge, and in getting payment of the f. o. b. price in United States dollars. (See affidavit of Earl Williams, plaintiffs' collective exhibit 31.)

In *United States* v. *Michele Diagonale*, 22 C. C. P. A. (Customs) 517, T. D. 47497, it was held that the fixing of prices by an association without any restriction upon resale or other disposition of the merchandise did not create a controlled market, in the sense that such prices might not be considered in determining the dutiable value of the merchandise.

In *United States* v. *Graham & Zenger, Inc.*, 31 C. C. P. A. (Customs) 131, C. A. D. 262, the court said (p. 134):

The merchandising practice herein set out does not, in our opinion, constitute the kind of trading contemplated by section 402 (c) *supra*, for the reason that it is not a price freely offered to all purchasers. Clearly all purchasers are not freely offered a price for the reason that those who purchase for home consumption are not free to dispose of the property they buy in all markets. The mandate of the Belgian Government which precludes such purchaser from disposing of his glassware for any use save that of home consumption clearly makes the sale conditional. It is a restriction as to use, and therefore the market is controlled. * * *

We do not deem it necessary to discuss the cases relied upon in the opinion of the trial judge, for the reason that generally speaking they all lay down the principle that a foreign market is controlled when restrictions are imposed on the resale, free use, dominion over the merchandise, or confining of sales to selected purchasers.

In the instant case no restrictions were imposed on the resale, free use, or dominion over the merchandise. While the conditions of sale stated to the packers by I. A. P. I. included approval of the pur-

chaser, there is no evidence of any selection of purchasers or of any rejection of a sale because of the purchaser.

The fact that the shippers had to obtain a large number of documents and make reports to various agencies was no doubt annoying and time consuming, but there is no evidence that any sales were actually prevented because of these conditions.

Plaintiffs refer to the requirements that dollar exchange proceeds be converted into Argentine pesos at the official rate and that exports to the United States be paid in United States dollars. Dollars were therefore the currency of the purchase and their subsequent conversion into pesos was a transaction between I. A. P. I. and the packer.

John J. O'Connor, vice president of Armour & Co., expressed the opinion that if the payments in dollars had been converted into Argentine pesos at the free rate, S. A. La Blanca and Frigorifico Armour de La Plata, S. A., would have exported larger quantities of canned corned beef to the United States because of the larger peso return to these companies. In other words, the companies would have received a higher price for their merchandise. The net result of the conversion requirements is therefore price fixing and not the kind of control which our courts have held constitutes a restricted market.

While I. A. P. I. may have had authority to prohibit the exportation of canned corned beef or impose such restrictions as to abolish a free market, the evidence indicates that the complicated system set up by I. A. P. I. and other Government agencies resulted in fixing prices without any other restrictions. Therefore, the market is not so controlled as to preclude the existence of an export value.

The next question involved is whether or not I. A. P. I. is the seller of the merchandise. It appears from the record herein that consular invoices and bills of lading were made out in the name of I. A. P. I. or I. A.P. I. through a particular packer. As stated above, the packer prepared two invoices, one on I. A. P. I.'s billhead and one on its own. Examples of the two invoices are attached to plaintiffs' collective exhibit 17. The first, on I. A. P. I.'s billhead, is directed to International Commercial Co., Inc., of Chicago and states in part:

16500 CASES OF BEEF IN CANS (LIBBY CC. BEEF 48/1)

|  |  |  | 11.30 | 186,450. |
| --- | --- | --- | --- | --- |
| 2% on $12,314.84 U. S. currency—tax for the pension fund for the merchant marine: |  |  |  | 246.30 |
|  |  |  |  | 186,696.30 |
|  | at $335.82 |  |  |  |
|  |  |  | 626,963.51 Argentine pesos |  |
| Marking: | 6000 |  |  |  |
|  | IAPI |  |  |  |

\*    \*    \*    \*    \*    \*    \*

Shipped by Swift de La Plata S. A.

The second, in the name of Compañía Swift de La Plata, states in part:

| Packages | Kind | Description | Kilos net | Price | Total |
|---|---|---|---|---|---|
| | | | U. S. DOLLARS | | |
| 16500 | CASES | BEEF IN CANS | PER CASE | | |
| | | (LIBBY CC. BEEF 48/1) | $11.30 | $186450. | |
| AT THE RATE OF EXCHANGE OF 335.82 | | | Pesos: | | 626136.39 |
| LESS 20% | | | Pesos: | 125227.28 | |
| LESS SALES TAX 1.25% | | | | 7826.70 | 133053.98 |
| | | | Pesos: | | 493082.41 |

Attached to plaintiffs' collective exhibit 19 are examples of other documents which must be obtained before shipment. The export permit gives the name of the exporting firm as Cia. Swift de La Plata, S. A. for the account of I. A. P. I. The loading permit names I. A. P. I. as the exporter and Compañía Swift de La Plata, S. A., as the shipper. The certificate of embarkation contains the following:

### Authorized Exporters

Exporting firm: INSTITUTO ARGENTINO DE PROMOCION DEL INTER-CAMBIO THROUGH THE CIA. SWIFT DE LA PLATA, S. A.

\* \* \* \* \* \* \*

EXPORTERS: INSTITUTO ARGENTINO DE PROMOCION DEL INTER-CAMBIO.

SHIPPERS: CIA. SWIFT DE LA PLATA, S. A.

Attached to plaintiffs' exhibit 25 is a copy of a report to the Central Bank of the Argentine Republic giving details of a shipment for export. It states in part:

The authorized exporter, Instituto Argentino de Promocion del Intercambio— No. 9621—hereby declares that it has shipped the following merchandise on August 5th, 1947, per s. s. "Mormacstar", which sailed August 5th, 1947, destined for the United States.

The packer or broker handles each sale with the purchaser, books freight and insurance, pays the export tax and all charges incident to export, and draws up all documents pertaining to shipment. I. A. P. I. does not assume any responsibility in connection with any of these operations including nonpayment by the buyer. In case the buyer defaults, I. A. P. I. collects its full 20 per centum charge and in case of claims by the purchaser, the packer is responsible.

Lawrence A. Borcherding, secretary-treasurer and a director of International Packers Commercial Co., Inc., formerly International Commercial Co., Inc., one of the importers herein, testified that his company never communicated with I. A. P. I. relative to the purchase of canned corned beef nor received any offers from it, nor did it look to I. A. P. I. for a guarantee that the merchandise would pass United

States Bureau of Animal Industry requirements; that labeling and shipping instructions were sent to Compañía Swift de La Plata; that the invoice and documents pertaining to the shipments were in the joint names of I. A. P. I. and Swift de La Plata.

Similar testimony was given by Robert C. Moore, assistant to the vice president in charge of foreign operations of Wilson & Co. of Chicago, and John J. O'Connor, vice president of Armour & Co., one of the importers herein.

Thomas Wells Holt, a dealer in food products in Jacksonville, Fla., testified that he went to Buenos Aires in October 1947 and approached various packers and brokers with reference to doing business in canned corned beef but that he did not go to I. A. P. I. as it had nothing to sell.

In defendant's collective exhibit A, a report of Jones R. Trowbridge, American consul in Buenos Aires, dated February 24, 1948, it is stated:

The IAPI is by decree the sole exporter of canned meats from Argentina. Therefore, all such shipments are made in the name of the IAPI and are invoiced on their stationery. The sale price from the packer to the IAPI is lower than the Argentine peso equivalent of the foreign price, by a percentage established in advance. At present the percentage on canned corned beef is 20 percent. The transaction in theory is that the IAPI buys the merchandise from the packer and sells it to the foreign customer. *However, in practice, what really happens is that the packer sells his own product in the United States at the best price obtainable, afterwards submitting the sale to the IAPI for their approval, which is more or less automatic.* When the merchandise is shipped, which may be some considerable time after the sale is closed and submitted to the IAPI, the packer invoices the customer on IAPI stationery at the agreed price and simultaneously invoices the IAPI at that price less the established percentage of 20 percent, IAPI having received the entire dollar proceeds of the sale to the foreign importer. *It will thus be evident that the entire transaction is for account and risk of the packer.* [Italics supplied.]

In defendant's collective exhibit B, a report of Fred H. Hauser, Jr., American vice consul in Buenos Aires, dated December 14, 1948, it is stated:

All operations in connection with sales of canned corned beef to the United States are handled by Cía. Sansinena. IAPI does not intervene in any way with the purchaser. All shipping arrangements are made by Sansinena, including payment of taxes, et cetera. IAPI does not assume any responsibility in connection with these operations. Claims for damage or nonpayment by consignee do not in any way affect IAPI's charge of 20%, Sansinena being the only one responsible for the whole operation.

The merchandise is purchased direct from Cía. Sansinena S. A., who owns the merchandise at the time of sale and offers it freely for export to the United States to all who wish to buy in the usual wholesale quantities, and there are no restrictions on the sales.   *   *   *

This evidence presents an anomalous situation. By the decree-law of May 28, 1946 (plaintiffs' exhibit 1), I. A. P. I. was given the power

to buy, sell, and deal in all kinds of property, and by the decree of August 23, 1946 (plaintiffs' exhibit 4), and the resolution of August 27, 1946 (plaintiffs' exhibit 5), it was directed to take charge of placing abroad all exportable surpluses of specified commodities, including canned corned beef. In the case of edible beef and mutton fats, I. A. P. I. entered into written contracts of purchase and sale with the packer, assuming full ownership, responsibility, and risk, and paying storage charges. I. A. P. I. also negotiated the sales for export on its own risk and behalf. (Plaintiffs' exhibit 8.) In the case of hides, I. A. P. I. entered into similar agreements of purchase and sale. Sales for export were made through normal commercial channels with private brokers and exporters acting as agents of I. A. P. I., offering the hides at prices established by I. A. P. I. and in the name of and on behalf of I. A. P. I. Packers were permitted to sell for I. A. P. I.'s account to other agents abroad and in such cases the packer received a commission paid by I. A. P. I. (Plaintiffs' exhibit 10.)

I. A. P. I. at first wished to establish some such system in regard to the sale of canned meats, but the packers protested, and eventually an arrangement was made whereby sales for export were permitted under the conditions outlined above. Offers were made by the packers, not by I. A. P. I.; all operations in connection with the sale, export, and shipment of the merchandise were handled by the packers; I. A. P. I. did not assume any responsibility for any of these operations. All that I. A. P. I. did was to approve or disapprove the sale and collect its 20 per centum charge. After it had approved a transaction, its only interest was to obtain its charge of 20 per centum. To protect that interest, certain documents were made out in its name and payment was required to be made to it. In effect, it had a first lien on the purchase price and did everything possible to protect that lien, but it never took the responsibilities of a seller of merchandise.

I. A. P. I. can be considered the seller only if it be found that the packers were acting as its agents in effecting sales. Any transaction between I. A. P. I. and the packers after the offer was accepted and I. A. P. I.'s approval given is immaterial. At the time the offers were made, the packers and not I. A. P. I. owned the merchandise. In the case of hides, where the packers did act as agents for I. A. P. I., I. A. P. I. took title to the merchandise; the packers offered the merchandise in the name of and on behalf of I. A. P. I., and were paid commissions by I. A. P. I. None of this was done in the case of canned corned beef. Leon Rubin, a food broker, testified that in making sales of Sansinena products, he received commissions from I. A. P. I. and from Sansinena, but there is no other evidence that I. A. P. I. paid commissions on the sale of canned corned beef.

I conclude that canned corned beef was offered and sold by the packers for their own account and not for the account of I. A. P. I.

and that such transactions as took place between I. A. P. I. and the packers after the offer was accepted by the purchaser and approved by I. A. P. I. were for the purpose of protecting I. A. P. I.'s charge of 20 per centum.

The next point to be considered is whether canned corned beef was freely offered or sold to all purchasers for export to the United States. According to the stipulated facts, a number of the packers in Argentina did not freely offer the merchandise for export to the United States, but Sansinena and Bovril were not included among these.

J. Bailey Pratt testified that he is a trader employed by H. J. Baker & Bro., which company exports and imports various merchandise, including canned meats; that in July 1938, he negotiated an agreement between his company and Sansinena, which agreement has been in effect since that date. Said agreement (plaintiffs' exhibit 12) appoints H. J. Baker & Bro. selling agent for Sansinena products in the United States and states that H. J. Baker & Bro. is granted exclusive rights in the United States in certain lines, including canned corned beef.

Mr. Pratt testified that pursuant to this agreement his firm sold canned corned beef to Charles H. Allen in January or February of 1948 and to Bickford in February 1948; that in making the sales, the order was sent to Sansinena for confirmation of the availability of the merchandise; that payment was made to Sansinena by letters of credit; that his company did not offer Sansinena canned corned beef to all possible purchasers in the United States from August 1, 1947, to date, because the price was out of line at times and the stock was not always available; that he considered food jobbers, chain stores, chain restaurants, and institutions as possible purchasers; that his company did not offer Sansinena canned corned beef on the west coast, nor to chain stores, nor to all food jobbers.

There was received in evidence a copy of a letter, dated March 29, 1948, from Sansinena to Crawford Co., stating that "having sold our stocks and future production up to the end of May next, we regret we are not in a position to submit a quotation for corned beef at this moment" (plaintiffs' collective exhibit 54). A copy of another letter, dated March 4, 1948, from Sansinena to Pacific Orient Associated states that "owing to the large demand, we are unable to submit a quotation just now, as our stocks are entirely cleared for the present. Goods are in the process of preparation however, and we will let you know immediately we have quantities available" (plaintiffs' collective exhibit 55). A copy of a letter from H. J. Baker & Bro. to Sansinena, dated January 7, 1948, refers to Praga Food Products Co., Inc., and states that it is inactive and not a good prospect (plaintiffs' exhibit 60).

Mr. Pratt testified that he had seen on shelves in stores Sansinena products imported by others than Allen and Bickford; that he received no commissions on such merchandise, but did receive a commission on sales made to Allen and Bickford.

Thomas Wells Holt testified that after the lifting of the embargo on the importation of canned corned beef in July 1947, he communicated with Sansinena relative to the purchase of canned corned beef, but it was not interested in doing business; that he went to Buenos Aires in October 1947 and approached various concerns with reference to doing business in canned corned beef; that he did not place any orders although he endeavored to purchase from Sansinena without success; that he made inquiries of Bovril and it was not interested; that after his return to the United States, he made a purchase from Sansinena through Sonny, Ltd.; that he subsequently made other purchases from Sansinena in February 1948 and December 1949; that he received an offer from Sansinena in September 1949.

Leon Rubin, a broker and trader in canned meats and other food products, testified that he dealt in canned corned beef from Argentina with Sansinena through American Mercantile Co.; that he received offers to sell Sansinena corned beef in the United States with no restrictions as to prospective purchasers; that he was free to offer it to anyone; that his dealings with Sansinena began when the embargo was lifted in July 1947; that he ceased to make offers after January 1948 because the prices were not suitable for the trade; that he made sales of Sansinena corned beef in August 1947 to Biddle Purchasing Co. (plaintiffs' exhibit 53).

Abraham Rayman, importer and exporter of general merchandise, testified that he dealt in canned corned beef from Argentina during the period from August 1, 1947, to December 31, 1948; that he received offers to sell Sansinena canned corned beef in the United States; that he was free to offer it to anyone; that he handled importations of canned corned beef from Argentina for Universal Meat Products during the period from August 1, 1947, to December 31, 1948; that in December 1947, acting as agent for Sansinena, he sold canned corned beef to Eastern Sausage & Provision Co.; that the merchandise was shipped directly to the purchaser; that he received commissions from Sansinena and from the purchaser; that this was the only transaction in which he acted as agent for Sansinena.

The report of Fred H. Hauser, Jr., dated December 14, 1948 (defendant's collective exhibit B), states that Sansinena freely offers the merchandise for export to the United States to all who wish to buy in the usual wholesale quantities. Lists of sales of Sansinena canned corned beef in cases of 48 12-ounce tins are attached to plaintiffs' exhibit 30, defendant's collective exhibit B, and defendant's collective exhibit C. It appears from these that sales were made to nine dif-

ferent purchasers during the period from August 13, 1947, to December 23, 1948, at prices ranging from $13.50 to $16.05 per case. It also appears that there were no sales between February 5, 1948, and August 9, 1948, and none in September or October of that year.

Attached to the affidavit of James Moffatt, administrator general of Bovril (plaintiffs' exhibit 24), is a list of sales which the affiant states "includes the prices freely quoted by Bovril to all purchasers in Argentine pesos on an f. a. s. basis in effect for the period from July 1, 1947 to December 31, 1948." The statement lists five sales of 48/1's [cases of 48 12-ounce tins] in December 1947, June 1948, and August 1948, all to Wetzel & Soler [brokers].

Plaintiffs claim that the foregoing establishes that the merchandise was not freely offered for sale for export to all purchasers by any of the packers.

While the agreement between Sansinena and H. J. Baker & Bro. purports to grant the latter an exclusive agency in the United States for the sale of canned corned beef, Sansinena did actually sell to others either directly or through other brokers. Therefore, the testimony of J. Bailey Pratt that his firm did not offer the merchandise to all possible purchasers is not sufficient to prove that Sansinena did not sell to all purchasers.

Mr. Holt testified that he was not able to purchase from Sansinena after the embargo was lifted in July 1947 and when he was in Buenos Aires in October 1947, but that he did make purchases in November 1947 and February 1948. He stated that he made no further purchases until December 1949 and that the only offer he received from Sansinena was in September 1949. However, the list of sales attached to defendant's collective exhibit C shows a purchase by T. W. Holt & Co. in November 1948.

A reading of the entire record on this point indicates that there were times when Sansinena had no merchandise on hand and at such times no offers were made and no prices quoted. However, except for the statements of J. Bailey Pratt, there is no evidence that the merchandise was not freely offered to all purchasers when it was available.

While it has been held that to freely offer an article for sale contemplates that some reasonable quantity must be ready or could be produced for reasonably prompt delivery, it has also been held that export value may be based upon the prices at which the merchandise is offered for future delivery. *Kuttroff, Pickhardt & Co. (Inc.)* v. *United States*, 14 Ct. Cust. Appls. 176, T. D. 41698; *White Lamb Finlay, Inc.* v. *United States*, 29 C. C. P. A. (Customs) 199, C. A. D. 192.

In the instant case Sansinena apparently had a limited quantity of merchandise to sell during the period in question and did not

make offers for future delivery when it was uncertain whether the merchandise would be available or not. However, since merchandise was available from time to time during this period, and since there was no discrimination against any purchaser or class of purchasers, the merchandise was freely offered for sale to all purchasers within the meaning of section 402 (d) of the Tariff Act of 1930.

The merchandise was appraised on the basis of export value and it is presumed that the appraiser found every fact to exist that was necessary to sustain his appraisement. *White Lamb Finlay, Inc. v. United States, supra*; *T. W. Holt & Co. v. United States*, 20 Cust. Ct. 367, Reap. Dec. 7523, affirmed in *Same v. Same*, 23 Cust. Ct. 243, Reap. Dec. 7714. It must be presumed that he found that the merchandise was freely offered to all purchasers for export to the United States. The evidence herein is not sufficient to overcome that presumption.

While the prices for the merchandise set forth in the lists of sales heretofore mentioned are not uniform, it appears that they were f. o. b. prices and included a number of charges which may have varied in amount, and it has been stipulated that the export values are the appraised unit values less such deductions, if any, which the court may find not properly a part of such export values.

I turn therefore to the question of what deductions, if any, should be made.

Appraisements in both cases herein were based upon the f. o. b. prices of similar merchandise produced by Sansinena and included the following charges:

Consular Fee
Bill of Lading Stamp
Cost of Packing
Export Permit Tax
Statistical Charge
Loading Permit Charge
Charge for placing merchandise on board vessel
Export Sales Tax of 1.25% of total f. o. b. Buenos Aires value
Charge of 20% upon full f. o. b. Buenos Aires value imposed by I. A. P. I.

A charge covering cartage to steamer was also included in reappraisement No. 183740-A. The plaintiffs state in their brief:

\* \* \* No question is here raised concerning this charge, nor the dutiability of the item entitled "cost of packing" which it is agreed is specifically made a part of export value by law.

It is contended, however, that all of the other items are nondutiable and should not be included in the export value.

The following explanation of the charges is established by the record:

"Consular Fee" represents the charge paid to the American consul at Buenos Aires for verifying invoices of merchandise exported to the United States.

"Bill of Lading Stamp" represents the cost of the consular stamp affixed to the bill of lading.

"Export Permit Tax" represents an Argentine tax of one-half of 1 per centum payable to the Secretary of Industry and Commerce to cover the cost of the export permit which must be obtained before the merchandise may be exported.

"Statistical Charge" represents a charge of three-tenths of 1 per centum imposed by customs authorities to cover the cost of clerical work incident to the issuance of the Loading Permit and the Embarkation Permit.

"Loading Permit Charge" represents the cost of the Loading Permit which is issued by the customhouse at the port of shipment.

"Charge for placing merchandise on board vessel" represents the cost of placing the merchandise on board the vessel from the dock.

"Export Sales Tax" is a tax of $1\frac{1}{4}$ per centum imposed by Argentina on the f. o. b. value of canned meats, including canned corned beef, exported to the United States.

"Charge of 20% upon full f. o. b. Buenos Aires value imposed by I. A. P. I." is the levy made by I. A. P. I. as indicated above.

It appears from the evidence that these items are paid only where the merchandise is exported from Argentina. Prices were ordinarily quoted to purchasers in the United States on an f. o. b. basis, including all these charges, but packers were also willing to sell ex plant or on an f. a. s. basis, in which cases the purchaser made all the arrangements with I. A. P. I., complied with all Government requirements, and paid the above-described charges.

Section 402 (d) of the Tariff Act of 1930 defines export value as follows:

> The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The above charges do not pertain to the cost of containers or coverings or the costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States. Therefore, they may be included in the export value only if they are

a part of the market value or price at which the merchandise was freely offered for sale to all purchasers for exportation to the United States.

It has been held that an export tax assessed upon merchandise at the time of exportation is not a part of the market value. *Sternfeld* v. *United States*, 12 Ct. Cust. Appls. 172, T. D. 40065. In that case, it was stipulated that the appraiser added to the entered value "the amount of an export tax assessed by the Government of China upon the merchandise in question when exported from China." The court said (pp. 173–174):

> We do not believe that the facts as stipulated warrant the conclusion that the purchaser could not secure the goods until he had paid the export tax; nor that the wholesale price included the tax; nor that the market value or the price of the merchandise at the time of exportation of the same to the United States included the export tax. We think that proper interpretation of the stipulation warrants the conclusion that an export tax was assessed by the Government of China upon the merchandise in question *at the time when* the same was exported from China, and that the tax did not accrue until that time had arrived, which is not, we think, the equivalent of saying that the export tax was included in the export value as defined in paragraph C, supra.

> \*   \*   \*   \*   \*   \*   \*

> However, if an export tax is an element of value in determining the market value or price, if it is a part thereof, it would properly be considered a part of export value as defined. In this case the export tax was not an element to be considered in determining market value, nor was it a part thereof, for the reason that, as we construe the stipulation, the tax did not accrue when the manufacturers sold such or similar merchandise, but did accrue only in case the merchandise was exported and at the time when it was exported. Therefore, the wholesale price of such or similar merchandise did not include the export tax. If the wholesale price of such or similar merchandise did not include the tax and if the purchasers of such merchandise "in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States," did not pay a price sufficient to cover the tax, the market value did not include it, even though the tax was paid by the purchasers upon exportation of the merchandise. \*   \*   \* [Italics quoted.]

See also Reap. Circ. 35120 where the court said:

> \*   \*   \* Manifestly where the payment of an export tax depends wholly upon whether merchandise which may be subjected thereto is exported from the country where it is purchased it is no part of the market value thereof. This is especially true when the tax is not paid upon purchase but as an extra charge for the privilege of exporting.

In *United States* v. *Tadross & Co. et al.*, 14 Ct. Cust. Appls. 10, T. D. 41528, rugs were purchased in the Chinese market at a certain rate per square foot including no expenses other than the price of the rug. Importers' agents paid the expenses incident to packing and shipping, commissions, and an export tax which was imposed only when such goods were exported and not on goods remaining in China. In the case of certain rugs imported from Persia, a penalty or additional duty of 12 per centum was imposed by Persian customs officials on

such rugs as were found to be aniline-dyed. It was held that neither tax was a part of export value. The court said (p. 12):

* * * It must be apparent, from a consideration of the record, that the price paid for the goods in question was the price at which such merchandise was freely offered for sale to all purchasers, in the principal markets of the countries from which the same was exported and in the usual wholesale quantities at the time of exportation, and in the usual course of trade, for any purpose, either of home consumption or export, and that such price did not include the export or aniline tax. * * *

See also *Balfour Guthrie & Co.* v. *United States*, Reap. Circ. 171, where the court referred to a decision of the Court of Appeals holding that an export tax is not a part of dutiable value and stated:

That decision certainly was not intended to set up two separate classes paying different amounts of tariff taxes on the same goods.

If when a man purchases himself or through an agent in a foreign country, pays an export tax (or has it paid for him), said tax is not part of the export value; but, on the other hand, if it is sold to him at so much including the amount of the export tax (which the foreigner has paid) it then becomes part of the export value, a hopeless and absurd inconsistency is produced.

On January 10, 1927, the Treasury Department issued T. D. 41935 which referred to *Sternfeld* v. *United States, supra*, and *United States* v. *Tadross & Co. et al., supra*, and stated:

In view of the foregoing decisions the appraiser of merchandise at New York is of the opinion, in which the department concurs, that export taxes which are paid only at the time of exportation, or export taxes which are included in c. i. f. or f. o. b. prices, and form no part of the purchase price, should not any longer be treated as part of export value.

While the Tariff Act of 1930 was being considered, the attention of Congress was called to the case of *United States* v. *Tadross & Co. et al., supra*, and it was suggested that the effect of the decision would be overcome by adding to the definition of export value a provision specifically making an export tax a part of dutiable value. Memorandum of Court Decisions Affecting Tariff Act of 1922, Committee on Ways and Means, p. 72. However, no such provision was enacted.

In the recent case of *Henry D. Gee Co.* v. *United States*, 24 Cust. Ct. 508, Reap. Dec. 7772, the court referred to the rulings in *Sternfeld* v. *United States, supra*, and *United States* v. *Tadross & Co. et al., supra*, and stated:

* * * This ruling is based upon the reasoning that the export value section of the tariff act seeks to ascertain the market value (as that term is defined in the section) of goods in the foreign market at the time when such goods are "packed ready for shipment to the United States," i. e., prior to shipment, and hence when such export taxes accrue *upon* exportation they form no part of the market value of the merchandise in the foreign market at the time contemplated by the valuation statute. [Italics quoted.]

In *United States* v. *Passavant*, 169 U. S. 16, it was held that a German tax which was imposed on the merchandise when it was sold for consumption or sale in the markets of Germany was a part of

dutiable value, even though it was remitted by the German Government when the goods were exported.

· It appears from the record herein that the I. A. P. I. charge accrues only upon exportation of the merchandise; that in the event the merchandise is not loaded on board ship for exportation, the charge is not paid; that the packers are willing to sell and in some cases do sell on an f. a. s. basis, in which case the I. A. P. I. charge and the other charges listed above are not included in the selling price but are paid by the purchaser upon exportation. Neither the I. A. P. I. charge nor the other charges are included in the *per se* price of the goods. Therefore, under the rulings in the above cases, they are not a part of the export value of the merchandise. Although most of the sales were on an f. o. b. basis, there cannot be two separate classes of importers paying different amounts of duty on the same type of merchandise. Whether or not the I. A. P. I. charge is technically an export tax, it did not accrue until after the merchandise was purchased and was about to be exported. In *New England Foil Corp.* v. *United States*, 8 Cust. Ct. 630, Reap. Dec. 5591, affirmed *sub nomine United States* v. *New England Foil Corp.*, 10 Cust. Ct. 596, Reap. Dec. 5856, the merchandise was sold on a c. i. f. duty-paid basis, and it was held that the export value was such price less freight, insurance, consular fee, and duty. So, in the instant case, the export value is either the f. a. s. price, or the f. o. b. price less the charges listed above.

In *United States* v. *Mutual Supply Co. et al.* and *Mutual Supply Co. et al.* v. *United States*, 11 Cust. Ct. 461, Reap. Dec. 5950, the American selling price of canned clams was involved. It appeared that the prices charged in San Francisco and other cities differed from those charged in Portland, Maine, due to the fact that the goods were sold ex warehouse and the seller added to the base price, freight, insurance, toll, wharfage, handling, and a margin to cover "warehouse storage, strikes, civil riots, * * *." The court said (p. 466):

* * * The price differential between eastern and western sales is the result of costs incurred after the merchandise is *"packed ready for delivery."* Under the definition of value in section 402 (g) of the Tariff Act of 1930, such charges are not a part of the American selling price. Such price only includes:

* * * the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition *packed ready for delivery*, * * * [Italics not quoted.]

The "delivery" of course is from the principal market. [Italics quoted.]

Similarly, export value as defined by section 402 (d) includes only those charges and expenses which occur prior to the time when the merchandise is packed ready for delivery or shipment.

Defendant argues that the f. a. s. price cannot be considered the export price on the ground that I. A. P. I. was the only person who could export and that in order for merchandise to be exported the

merchandise had to be sold to I. A. P. I. which then offered it and sold it at a price including all charges. However, as indicated above, the evidence does not support the contention that I. A. P. I. was the seller of the merchandise. While the purchaser had to pay the I. A. P. I. levy and other charges in order to export the merchandise, he could have bought the merchandise *per se* for a price which did not include these charges. Such price is the dutiable export value.

It has been stipulated that a foreign value exists for the merchandise herein, namely, 8.70 pesos per dozen tins, net packed, for the merchandise covered by reappraisement No. 183740–A and 9 pesos per dozen tins, net packed, for the merchandise covered by reappraisement No. 184568–A.

It has also been stipulated that the export value is the appraised unit values less such deductions as the court may find proper and that the appraisements herein were based upon the f. o. b. prices of similar merchandise produced by Sansinena which included the charges set forth in consular invoice No. 6713 (plaintiffs' collective exhibit 13) and consular invoice No. 6691 (plaintiffs' collective exhibit 14). The f. o. b. price on consular invoice No. 6713 is $13.50 per case and included the following charges per 1,000 cases:

| | |
|---|---:|
| Cartage to steamer | $12. 50 |
| Placing on board vessel | 125. 00 |
| Statistical charges | 41. 00 |
| Loading permit | 5. 00 |
| Bill of lading stamp | 1. 00 |
| Consular fees | 2. 50 |
| IAPI's trade charge | 2, 700. 00 |
| Cost of packing | 685. 00 |
| Sales tax | 168. 75 |
| Export permit | 67. 50 |
| | $3, 808. 25 |

Omitting the charge for cartage to steamer, about which no question has been raised, and the cost of packing, concededly a dutiable charge, the charges per case amount to $3.11, which, deducted from the f. o. b. price of $13.50, gives the dutiable export value of $10.39.

Consular invoice No. 6691 covers 2,000 cases of 48 tins of 12 ounces each at $14.50 per case ($29,000) and 2,000 cases of 12 tins of 6 pounds each at $26.25 per case ($52,500). The following charges are included:

| | |
|---|---:|
| Placing on board vessel | $775. 00 |
| Statistical charges | 244. 50 |
| Loading Permit | 5. 00 |
| Bill of Lading Stamp | 1. 00 |
| I. A. P. I.'s Trade Charge—20% | 16, 300. 00 |
| Consular Invoice | 2. 50 |
| Cost of Packing | 3, 853. 25 |
| Sales Tax on F. O. B. Value—1¼% | 1, 018. 75 |
| Export Permit | 407. 50 |
| | $22, 607. 50 |

The statistical charge is three-tenths of 1 per centum of the f. o. b. value of the merchandise, the I. A. P. I. trade charge is 20 per centum thereof, the sales tax is 1¼ per centum thereof, and the export permit charge is one-half of 1 per centum thereof; therefore, the amounts of these items chargeable to the 2,000 cases of 48 tins of 12 ounces each are $87, $5,800, $362.50, and $145, respectively. Since the cost of the said 2,000 cases is 35.58 per centum of the total value of the merchandise covered by the invoice, such percentage of the other items is chargeable to these cases. The total amounts to be charged to these cases are as follows:

| | |
|---|---:|
| Placing on board vessel | $275.75 |
| Statistical charges—.3% | 87.00 |
| Loading Permit | 1.78 |
| Bill of Lading Stamp | .36 |
| I. A. P. I.'s Trade Charge—20% | 5,800.00 |
| Consular Invoice | .89 |
| Cost of Packing | 1,370.99 |
| Sales Tax on F. O. B. Value—1¼% | 362.50 |
| Export Permit—.5% | 145.00 |
| | $8,044.27 |

Omitting the cost of packing, the charges per case amount to $3.34, which, deducted from the f. o. b. price of $14.50, gives the dutiable export value of $11.16.

The foreign value expressed in dollars converted at the official rate of $0.297733 per peso is $2.59 per dozen tins or $10.36 per case for the merchandise in reappraisement No. 183740–A and $2.6796 per dozen tins or $10.7184 per case for the merchandise in reappraisement No. 184568–A. Conversion at either the undesignated rate of $0.251247 or the so-called free rate of $0.2475 in the case of reappraisement No. 183740–A and $0.2490 in the case of reappraisement No. 184568–A would result in even lower foreign values. Since it appears that the export values are higher in any event, it is unnecessary to pass upon plaintiffs' contention that conversion should be made at the so-called free rate (which was not certified by the Federal Reserve bank).

On the record herein I make the following findings of fact:

1. That the merchandise consists of first-grade canned corned beef packed 48 tins of 12 ounces each per case.

2. That the merchandise was the product of Argentina and was exported in the case of reappraisement No. 183740–A on August 5, 1947, and in the case of reappraisement No. 184568–A on October 17, 1947.

3. That the merchandise in reappraisement No. 183740–A was entered at 8.70 Argentine pesos per dozen tins net packed, on the basis of the foreign market value under section 402 (c) of the Tariff Act of 1930, as amended.

4. That the merchandise in reappraisement No. 184568–A was entered at 8.45 Argentine pesos per dozen tins net packed, on the basis of the foreign market value under section 402 (c) of the Tariff Act of 1930, as amended.

5. That the merchandise in reappraisement No. 183740–A was appraised at $13.50 (United States currency) net packed per case of 48 tins on the basis of the export value under section 402 (d) of the Tariff Act of 1930.

6. That the merchandise in reappraisement No. 184568–A was appraised at $14.50 (United States currency) net packed per case of 48 tins on the basis of the export value under section 402 (d) of the Tariff Act of 1930.

7. That Buenos Aires was the principal market in Argentina for the sale of first-grade canned corned beef both for export to the United States and for consumption in Argentina.

8. That sales and offers for sale of canned corned beef for export to the United States were made by the packers or producers thereof and such sales or offers were not made by I. A. P. I.

9. That Compañía Sansinena was the only producer or packer of first-grade canned corned beef in Argentina who freely offered its product for sale for export to the United States on or about the dates of exportation of the merchandise involved herein; that such offers were made on an f. o. b. or an f. a. s. basis.

10. That the appraisement of the merchandise covered by reappraisement No. 183740–A was based upon a sale of 1,000 cases of first-grade canned corned beef made by said Compañía Sansinena at $13.50 (United States currency) per case f. o. b. vessel Buenos Aires.

11. That said price of $13.50 per case included in addition to the *per se* price of the merchandise the following charges (for 1,000 cases):

| | |
|---|---|
| Cartage to steamer | $12. 50 |
| Placing on board vessel | 125. 00 |
| Statistical charges | 41. 00 |
| Loading permit | 5. 00 |
| Bill of lading stamp | 1. 00 |
| Consular fees | 2. 50 |
| IAPI's trade charge | 2, 700. 00 |
| Cost of packing | 685. 00 |
| Sales tax | 168. 75 |
| Export permit | 67. 50 |
| | $3, 808. 25 |

12. That a charge for cartage to the steamer would have been included in the f. a. s. price of the merchandise.

13. That the appraisement of the merchandise covered by reappraisement No. 184568–A was based upon a sale of 2,000 cases of

first-grade canned corned beef made by said Compañía Sansinena at $14.50 (United States currency) per case f. o. b. vessel Buenos Aires.

14. That said price of $14.50 per case included in addition to the *per se* price of the merchandise the following charges (for 2,000 cases):

| | |
|---|---:|
| Placing on board vessel | $275. 75 |
| Statistical charges—.3% | 87. 00 |
| Loading Permit | 1. 78 |
| Bill of Lading Stamp | . 36 |
| I. A. P. I.'s Trade Charge—20% | 5, 800. 00 |
| Consular Invoice | . 89 |
| Cost of Packing | 1, 370. 99 |
| Sales Tax on F. O. B. Value—1¼% | 362. 50 |
| Export Permit—.5% | 145. 00 |
| | $8, 044. 27 |

15. That the I. A. P. I. trade charge, the statistical charge, the loading permit charge, the bill of lading stamp, the export sales tax, and the export permit tax accrued upon exportation of the merchandise.

16. That the charges for placing the merchandise on board vessel and the consular fee are necessarily incurred in the exportation of the merchandise to the United States.

17. That said charges, amounting to $3.11 per case in reappraisement No. 183740–A and $3.34 per case in reappraisement No. 184568–A, accrued after the merchandise was packed ready for shipment to the United States in the principal market of Argentina and were not part of the market value of the merchandise.

18. That on or about August 5, 1947, first-grade canned corned beef similar to the merchandise covered by reappraisement No. 183740–A was freely offered for sale for export to the United States in Buenos Aires, the principal market of Argentina, packed ready for shipment to the United States at $13.50 less $3.11 per case of 48 tins of 12 ounces each or at a net price of $10.39 per case.

19. That on or about October 17, 1947, first-grade canned corned beef similar to the merchandise covered by reappraisement No. 184568–A was freely offered for sale for export to the United States in Buenos Aires, the principal market of Argentina, packed ready for shipment to the United States at $14.50 less $3.34 per case of 48 tins of 12 ounces each or at a net price of $11.16 per case.

20. That the net prices set forth in findings 18 and 19 were both higher than the foreign market value as defined in section 402 (c) on the dates of exportation.

On these facts I conclude as a matter of law:

1. That the export value, as that value is defined in section 402 (d) of the Tariff Act of 1930, is the proper basis for determining the value of the instant merchandise.

2. That such value for the merchandise covered by reappraisement No. 183740–A is $10.39 per case of 48 tins of 12 ounces each net packed.

3. That such value for the merchandise covered by reappraisement No. 184568–A is $11.16 per case of 48 tins of 12 ounces each net packed.

Judgment will be rendered accordingly.